# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00414-CR

**Myron Bishop Head, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
NO. 09-1170-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Myron Bishop Head of four counts of the offense of aggravated robbery. *See* Tex. Penal Code Ann. § 29.03 (West 2011). Punishment was assessed at 75 years' imprisonment on each of counts one, two, and three, and 90 years' imprisonment on count four, with the sentences to run concurrently. In five points of error on appeal, Head asserts that the district court: (1) erred in denying his challenge to two of the State's peremptory strikes; (2) abused its discretion in admitting evidence of an extraneous offense; (3) abused its discretion in overruling Head's objection to an allegedly improper closing argument by the prosecutor; (4) erred in not including in the charge on punishment an instruction that the jury must disregard certain extraneous-offense evidence; and (5) abused its discretion in admitting evidence during punishment of extraneous offenses for which the State allegedly failed to provide reasonable notice. We will affirm the judgments of conviction.

## BACKGROUND

The jury heard evidence that on the night of August 9, 2009, five women were robbed by two men at gunpoint outside a hotel in Round Rock. The evidence tended to show that, during the course of the robbery, one of the women attempted to resist and flee but was caught and physically assaulted by one of the men, who hit and kicked her repeatedly after she had fallen to the ground. According to the testimony of one of the other victims who had witnessed the assault, after the man had subdued the woman, he grabbed her purse and jumped into a blue SUV along with the other man, and sped away in the vehicle. The women then ran into the hotel and called the police.

Shortly thereafter, after receiving a description of the suspect vehicle, officers with the Round Rock Police Department observed the vehicle traveling at a high rate of speed. The officers initiated pursuit. According to the testimony of one of the pursuing officers, Sergeant Nate Zoss, one of the suspects was observed jumping out of the vehicle as it slowed down to stop. After the vehicle had stopped, two other suspects fled the vehicle. Remaining inside the vehicle were two female suspects later identified as Kimberly Almanza and Ashley Markowsky, both of whom were arrested and provided statements. One of the three suspects who had fled the vehicle, later identified as William Ellis, was found walking alongside the frontage road of IH-35 and was arrested. Ellis was identified as the driver of the vehicle.

The two other suspects who had fled the vehicle were later alleged to be the gunmen. One of the gunmen, later identified as Jontae Love, was eventually apprehended in San Antonio. The other suspected gunman, Head, was apprehended on the night of the robbery. Kristopher Fischer, an eyewitness for the State, testified that on the night in question, he saw an

individual with a handgun get into an SUV and decided to follow the vehicle and call the police.[1] Fischer, who was pursuing the vehicle at the same time as the police, testified that he had observed an individual jump out of the vehicle and flee. While the police continued pursuing the vehicle, Fischer decided to follow the individual and was able to notify the police of the individual's whereabouts. Eventually, the officers came upon a man lying on the ground in the middle of a field, apprehended him, and brought him to Fischer, who identified him as the same individual whom he had been following. The man, later identified as Head, was then arrested. One of the officers who had arrested Head testified that a large sum of money was found on Head's person, along with a wallet containing an identification card that belonged to Jontae Love.

Three of the State's witnesses were Head's alleged accomplices—Love, Markowsky, and Almanza. They provided detailed testimony implicating Head in the robberies. Love testified that, among other things, he and Head had robbed the women at gunpoint and that Head had assaulted one of the women when she had refused to hand over her purse. Markowsky testified in part that, as they were driving away following the robbery, Head told her that "[h]e had to pistol-whip that bitch because she wouldn't give up her purse." Almanza testified that, among other things, when Head had jumped out of the vehicle during the flight from the police, he had possession of the money that had been stolen from the women.

The jury found Head guilty of all four counts of aggravated robbery as alleged, and punishment was assessed as noted above. This appeal followed.

---

[1] During the punishment phase, the State presented evidence tending to show that Fischer had also been robbed by Head and his accomplices that night and that, after the incident, Fischer had decided to pursue the robbers and inform the police of their whereabouts.

3

**ANALYSIS**

### *Batson* challenge

Before the jury was empaneled, Head made a *Batson* challenge to two of the State's peremptory strikes, claiming that they were racially motivated. *See Batson v. Kentucky*, 476 U.S. 79 (1986). The potential jurors who Head claimed were struck on the basis of race were juror number 25 and juror number 47, both of whom were identified as African-Americans. After hearing argument concerning the State's explanations for these strikes, the district court ultimately denied Head's *Batson* challenge as to both jurors. In his first point of error, Head asserts that the district court erred in denying his *Batson* challenge.

In *Batson*, the United States Supreme Court held that a prosecutor is forbidden from exercising peremptory strikes based solely on the race of the potential juror. *Id*. at 89. To succeed on a *Batson* challenge, the defendant must demonstrate, by a preponderance of the evidence, that the prosecutor indulged in purposeful discrimination against a member of a constitutionally-protected class in exercising his peremptory challenges. *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). There is a three-step process for evaluating claims that a prosecutor has impermissibly exercised its peremptory challenges on the basis of race. *See Hernandez v. New York*, 500 U.S. 352, 358 (1991). "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." *Id*. (citing *Batson*, 476 U.S. at 96-97). "Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question." *Id*. (citing *Batson*, 476 U.S. at 97-98). "Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." *Id*. (citing *Batson*, 476 U.S. at 98).

4

On appeal, the State does not dispute that Head satisfied his step-one obligation to make a prima facie showing that the State exercised its peremptory challenges on the basis of race, nor did the State challenge that showing below. Thus, our review is confined to the second and third steps of the analysis.[2] "At the second step of this process, the proponent of the strike need only tender an explanation that is race-neutral on its face." *Watkins*, 245 S.W.3d at 447 (citing *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)). "The ultimate plausibility of that race-neutral explanation is to be considered as part of the third step of the analysis, in which the trial court determines whether the opponent of the strike (usually the defendant) has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the product of the proponent's purposeful discrimination." *Id*. (citing *Purkett*, 514 U.S. at 768).

"Whether the opponent [of the strike] satisfies his burden of persuasion to show that the proponent's facially race-neutral explanation for his strike is pre-textual, not genuine, is a question of fact for the trial court to resolve in the first instance." *Id*. (citing *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004) ("The term 'pretext' is solely a question of fact; there is no issue of law.")). Accordingly, on appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is "clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *Watkins*, 245 S.W.3d at 447-48. In other words, the trial court's ruling will not be disturbed on appeal unless the reviewing court is "left with a definite and firm conviction that a mistake has been committed." *Hernandez*, 500 U.S. at 369. "This is a highly deferential standard because the trial court is in the best position to determine whether a prosecutor's facially race-neutral explanation for a peremptory strike is genuinely race-neutral." *Gibson*, 144 S.W.3d at 534; *see also*

---

[2] Consequently, we are not called upon to address the implications of *Hassan v. State*, 369 S.W.3d 872, 875-78 (Tex. Crim. App. 2012).

*United States v. Williams*, 264 F.3d 561, 572 (5th Cir. 2001) (*Batson* inquiry is "quintessentially a question of fact which turns heavily on demeanor and other issues not discernable from a cold record, such that deference to the trial court is highly warranted").  Therefore, "in the absence of exceptional circumstances," we are to defer to the trial court.  *Hernandez*, 500 U.S. at 366.  We may not substitute our opinion for the trial court's factual assessment of the neutrality of the prosecutor's explanation for exercising strikes, and we focus on the genuineness, rather than the reasonableness, of the prosecutor's asserted nonracial motive.  *Gibson*, 144 S.W.3d at 534.  Moreover, we are to view the evidence relevant to the *Batson* challenge in the light most favorable to the trial court's ruling.  *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992); *Moore v. State*, 265 S.W.3d 73, 78 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

We begin our analysis with juror 25.  The State offered multiple explanations for this strike, specifically that the juror had stated that she favored a sentence based on rehabilitation over punishment or deterrence, had indicated that she believed it was unfair for a co-defendant to receive a reduced sentence if he testified for the State, and had children in the same age range as the defendant.  These are legitimate, race-neutral reasons for striking a potential juror.  *See, e.g.*, *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002) (juror's perceived bias against aspect of case); *Moore v. State*, 265 S.W.3d 73, 87 (Tex. App.—Houston [1st Dist.] 2008), *pet. dism'd, improvidently granted*, 286 S.W.3d 371 (Tex. Crim. App. 2009) (juror's parental status); *Montgomery v. State*, 198 S.W.3d 67, 76 (Tex. App.—Fort Worth 2006, pet. ref'd) (belief in rehabilitation as primary goal of punishment); *see also Bell v. Ozmint*, 332 F.3d 229, 240 n.5 (4th Cir. 2003) (juror had children of similar age to defendant).  Thus, the remaining question is whether the record, viewed in the light most favorable to the denial of the *Batson* challenge, supports

6

the district court's finding that Head failed to prove by a preponderance of the evidence that these race-neutral reasons were not genuine but instead were a pretext for racial discrimination.

We conclude that the record supports the district court's finding. The defendant was approximately 20 years old at the time he allegedly committed the offense. It is undisputed that juror 25 had children in the age range of 19 to 21. Thus, the district court would not have clearly erred in finding that this explanation for the strike was genuine. Head contends that the stated reason was not genuine because there were other jurors who had children who were not struck. However, the record reflects that these other jurors had children who were further removed in age from the defendant, including juror 4, who had children in the range of 3 to 25; juror 9, who had children in the range of 21 to 31; and juror 50, who had children in the range of 26 to 35.[3] Thus, the district court could have reasonably concluded that these other jurors were not similarly situated to the juror who was struck. Head also asserts that the age explanation was not genuine because the State never questioned the jurors about how having children similar in age to the defendant would affect their judgment. However, a lack of questioning does not automatically undermine a proposed race-neutral explanation. *See Chambers v. State*, 866 S.W.2d 9, 24 (Tex. Crim. App. 1993). Here, the district court would not have clearly erred in concluding that the prosecutors, based on their prior trial experience, genuinely believed that having children who were similar in age to the defendant could have a tendency to make the juror more sympathetic to the defendant's circumstances.

---

[3] These age ranges were presumably gleaned from the juror information cards, which have not been included in the record on appeal. However, the prosecutor recited these age ranges in open court on the record, and they were not disputed by Head. Accordingly, we are to accept these statements by the prosecutor as true. *See Emerson v. State*, 820 S.W.2d 802, 804 (Tex. Crim. App. 1991).

Additionally, the State gave reasons for striking juror 25 other than the age of her children. When the prosecutor asked if it was "fair" for a co-defendant to testify and "get a deal," juror 25 answered, "I don't think it's fair." A critical component of the State's case, the district court could have reasonably found, was the testimony of Head's co-defendants. The prosecutor also noted at the time the question was asked that juror 25 had a "skeptical" face "again," which, the district court could have reasonably surmised, indicated that the prosecutor had earlier noticed the juror's demeanor in response to the prosecutor's questions and was genuinely concerned about the juror's attitude toward the State. Juror 25 also was the first juror to answer that "rehab" should be the primary purpose of a defendant's sentence. Finally, juror 25 was one of the jurors who, when asked if she could disregard illegally obtained evidence if instructed to do so, answered, "No." In conclusion, there were multiple reasons for the State to strike juror 25 that had nothing to do with her race, and on this record, we cannot conclude that the district court clearly erred in concluding that these reasons were genuine.

Regarding juror 47, the stated reasons for this strike were that juror 47 had children in the same age range as the defendant and was unemployed. These are legitimate, race-neutral reasons for a strike. *See Adair v. State*, 336 S.W.3d 680, 687 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (employment status); *Moore*, 265 S.W.3d at 87 (children). And, on this record, we cannot conclude that the district court clearly erred in finding that Head failed to satisfy his burden to prove that these reasons were a pretext for racial discrimination. It was undisputed that juror 47 had children in the same age range as the defendant, and the prosecutor explained her reasoning for the strike as follows: "I was looking for [children ages] 19 to 21, because the Defendant's specifically 20 years old. So those are the specific age ranges that on my notes I circled, a C for child and a circle, which [juror 47] had." In response, Head pointed out that other jurors also had children, but

8

he did not counter the prosecutor's explanation that the State was looking for jurors with children in a specific, narrow age range. Nor did Head challenge in any way the genuineness of the State's additional race-neutral explanation that it had also struck juror 47 because she was unemployed. Thus, there is nothing in this record that leaves us "with a definite and firm conviction that a mistake has been committed" in the district court's denial of Head's *Batson* challenge as to this juror.[4] *See Hernandez*, 500 U.S. at 369.

We overrule Head's first point of error.

**Evidentiary objections during guilt-innocence**

Prior to the testimony of Kristopher Fischer, Head objected to the admission of evidence tending to show that Fischer had observed Head in possession of a firearm on the night of the robbery. Head argued that this was extraneous-offense evidence admitted solely for character-conformity purposes and that it was more prejudicial than probative. *See* Tex. R. Evid. 403, 404(b). The district court overruled Head's objections to the evidence. In his second point of error, Head asserts that the district court abused its discretion in admitting the evidence.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008). The test for abuse of discretion is whether the trial court acted arbitrarily or unreasonably, without reference to any

---

[4] Moreover, to the extent that harm is relevant to our analysis, we also observe that the twelfth juror to be seated on the jury in this case was juror 45. Therefore, juror 47 would have been selected, if at all, as the alternate juror. But the alternate juror in this case was never called upon to serve. Consequently, even if the district court had sustained Head's *Batson* challenge to juror 47, she would not have deliberated on the case, and thus Head would be unable to show that he was harmed by the error, if any, in excluding the juror. *See Rousseau v. State*, 855 S.W.2d 666, 680 (Tex. Crim. App. 1993); *Johnson v. State*, 959 S.W.2d 284, 294 (Tex. App.—Dallas 1997, pet. ref'd).

guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). A trial court abuses its discretion only when its decision "is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. Tex. R. Evid. 404(b). It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id*. "The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "'Rule 404(b) is a rule of inclusion rather than exclusion.'" *Id*. (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). "The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id*. (citing *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)). A trial court's ruling on extraneous offense evidence is generally within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *Id*. at 344 (citing *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997)).

Here, the record supports the district court's finding that the evidence was admissible for purposes other than character conformity. Specifically, the district court would not have abused its discretion in finding that Fischer's testimony tended to establish Head's identity as one of the gunmen during the robbery and to corroborate the testimony of the accomplice witnesses. *See*

10

*Lawton v. State*, 913 S.W.2d 542, 553 n.9 (Tex. Crim. App. 1995); *Lacaze v. State*, 346 S.W.3d 113, 119 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).  Additionally, the district court would not have abused its discretion in finding that because Fischer's observation of Head in possession of a firearm occurred on the same night and at around the same time as the charged offense, the evidence had a tendency to impart "information essential to understanding the context and circumstances of the events" surrounding the charged offense and thus qualified as "same transaction contextual evidence," which is another purpose for which extraneous-offense evidence is admissible under Rule 404(b).  *See Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993).

Nor would it have been outside the zone of reasonable disagreement for the district court to conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.  "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).  "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*.  "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997).  Evidence should be excluded under rule 403 only when there exists "a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996).

Here, the district court could have reasonably found that the probative value of the evidence was high.  The victims of the robbery were unable to identify the men who had robbed them at gunpoint.  Thus, the district court could have reasonably concluded that the State needed

11

Fischer's testimony in order to corroborate the testimony of the accomplice witnesses who had identified Head as one of the gunmen. At the same time, the district court could have reasonably concluded that there was not a "clear disparity" between the degree of prejudice of the offered evidence and its probative value. Fischer did not describe the circumstances surrounding Head's possession of the firearm. Instead, the prosecutor simply asked Fischer if, around 2:00 to 3:00 in the morning, Fischer saw an individual, later identified as Head, with a small, black handgun in his hand. Fischer answered in the affirmative. That was the extent of Fischer's testimony regarding the firearm during the guilt / innocence phase.

On this record, we cannot conclude that the district court abused its discretion in admitting the evidence. We overrule Head's second point of error.

**Improper jury argument**

In his third point of error, Head asserts that the district court abused its discretion in overruling Head's objection to an argument by the prosecutor during closing that, in Head's view, constituted an improper comment on Head's right to a jury trial. The argument to which Head objected was the following:

| [Prosecutor]: | So now we're going to talk about Jontae Love. And somehow he's looking out for number one? Anybody else want to do 40 years, aggravated robbery? Forty years? Do you think he got some kind of sweetheart deal for that? And you know, Defense is right, everyone is entitled to a jury trial. Everyone does have the right to a jury trial. But you sure do get points for not making the victims testify in a jury trial. And every other co-defendant— |
|---|---|
| [Defense counsel]: | I object, Your Honor. That's an impingement on my client's right to get a fair trial. |

12

| [Prosecutor]: | Responding to Defense counsel. I think it's open argument, and he's implying that somehow there was some sweet deal which, by accepting responsibility and pleading guilty, should also be considered. |
| --- | --- |
| [The Court]: | I'm not sure I understand your objection. |
| [Defense counsel]: | Your Honor, it's commenting on my client's right to a jury trial. |
| [Prosecutor]: | I'm responding to Defense counsel's argument, Your Honor. |
| [The Court]: | All right. Objection is overruled. |
| [Prosecutor]: | He said everyone has the right to a jury trial. You remember, that's the first thing he said when he stood up. Everyone has the right to a jury trial. But you know what? You sure do get credit for accepting responsibility and not making someone go through a jury trial, and that's what Jontae Love did. He could have—he has a right to a jury trial, too. He has just the same right. And he could have said, "State, meet your burden. I'm not going to plead guilty. I'm not going to accept responsibility. I'm not going to assist. I'm not going to try to right the wrong that I've committed." He could have done that. Instead, he stood up and took forty years on aggravated robbery. |

Proper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973); *Watts v. State*, 371 S.W.3d 448, 457 (Tex. App.—Houston [14th Dist.] 2012, no pet.). We review a trial court's ruling on an objection to improper jury argument for abuse of discretion. *See Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004); *Nzewi v. State*, 359 S.W.3d 829, 841 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to any guiding rules and principles. *Montgomery*

13

*v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).  Under this standard, we are to uphold the trial court's ruling unless it is so clearly wrong as to lie outside that zone within which reasonable persons might disagree.  *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

Head asserts that the prosecutor's argument was an improper comment on Head's election to proceed with a jury trial.  *See Villareal v. State*, 860 S.W.2d 647, 649 (Tex. App.—Waco 1993, no pet.).  "When a comment is made by a prosecutor regarding a defendant's election to proceed with a jury trial, the concern of the court centers around whether the prosecutor had, in effect, asked the jury to punish or otherwise penalize the defendant for exercising his right to a trial by jury."  *Carlock v. State*, 8 S.W.3d 717, 724 (Tex. App.—Waco 1999, pet. ref'd).

In this case, the district court would not have abused its discretion in concluding that the prosecutor's argument was not a comment on Head's right to a jury trial, but instead was a response to defense counsel's argument attacking the credibility of Love's testimony.  Specifically, defense counsel had argued that because Love had testified for the State, and did so reluctantly, Love must have received some sort of "deal" from the State in exchange for his testimony.[5]  The

---

[5]  Specifically, defense counsel had argued,

> And then we've got Jontae Love. . . .  And the prosecutor had to direct him or basically drag him like a stubborn mule through his testimony.  I'm not sure how much information you really get or how much you can really evaluate the credibility of a person who's answering or nodding yes or no or grunting.  He didn't say a whole lot.  He was being forced through his testimony by the State in order to get the deal he got, and that doesn't sound like too good a deal, either.

Defense counsel went on to suggest that it was Love, and not Head, who had assaulted one of the victims:

> And the last thing [Love]'s not being direct with you about is who struck [the victim] with the pistol—or with a handgun; put it that way.  You know, he came in here and testified against Mr. Head, but you know he's doing it for the same reason everyone else is.  He's doing it to look out for number one, and he's doing it—if he's going

14

clear implication of defense counsel's argument, the district court could have reasonably found, was that Love's testimony was not to be trusted. Therefore, the district court could have reasonably concluded that the prosecutor was merely countering defense counsel's credibility argument by placing Love's decision to testify in a positive light, arguing that by cooperating with the State, Love was taking responsibility for his actions. At no point during the argument did the prosecutor refer to Head's decision to proceed with a jury trial or request that the jury punish Head for proceeding to trial. The argument was focused solely on Jontae Love and his decision to cooperate with the State, which, defense counsel had argued, made Love's testimony not credible. Additionally, at the beginning of his argument, defense counsel had stated that "everybody has a right to a jury trial." The prosecutor, in his argument, expressly referred to this statement of defense counsel and in fact agreed with it. The prosecutor then proceeded to use defense counsel's statement to answer counsel's attack on Love's credibility. For these reasons, it would not have been outside the zone of reasonable disagreement for the district court to conclude that the prosecutor's argument was nothing more than a response to the argument of opposing counsel. *See Carlock*, 8 S.W.3d at 724; *Taylor v. State*, 987 S.W.2d 597, 599-600 (Tex. App.—Texarkana 1999, pet. ref'd).

We overrule Head's third point of error.

## Punishment issues

### *Alleged charge error*

During the punishment phase, the State introduced evidence tending to show that multiple robberies were committed by Jontae Love on or about July 24, 2009. The State sought to

---

to do that, he's going to minimize his own participation where ever possible. He's going to blame other people for what he's done. Don't you know that's what he did in this case? Don't you know that?

15

prove that Head had participated in those robberies. In his fourth point of error, Head asserts that the district court erred in refusing his request to include instructions in the court's punishment charge that the jury *must* disregard this evidence.

We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). We first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Swearingen*, 270 S.W.3d at 808. If error exists, we then evaluate the harm caused by the error. *Ngo*, 175 S.W.3d at 743; *Swearingen*, 270 S.W.3d at 808. The degree of harm required for reversal depends on whether that error was preserved in the trial court. When error is preserved in the trial court by timely objection, the record must show only "some harm." *Almanza*, 686 S.W.2d at 171; *Swearingen*, 270 S.W.3d at 808. By contrast, unobjected-to charge error requires reversal only if it resulted in "egregious harm." *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

The alleged charge error in this case concerns the evidence presented at punishment. "For purposes of assessing punishment, the prosecution may offer evidence of any extraneous crime or bad act that is shown, beyond a reasonable doubt, either to have been (1) an act committed by the defendant or (2) an act for which he could be held criminally responsible." *Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999) (citing Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a) (West 2005)). However, "[t]he statute requires that such evidence may not be considered in assessing punishment until the fact-finder is satisfied beyond a reasonable doubt that these prior acts are attributable to the defendant." *Id.* Accordingly, when extraneous-offense evidence is offered during punishment, the district court is required to instruct the jury that such evidence may not be considered in assessing

16

punishment until the jury is satisfied beyond a reasonable doubt that the extraneous offense is attributable to the defendant. *Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App. 2000).

Here, the district court provided the required instruction:

> You may consider evidence of an extraneous crime or bad act in assessing punishment even if the Defendant has not yet been charged with or finally convicted of the crime or act. However, you may consider such evidence only if the extraneous crime or bad act has been proven by the State beyond a reasonable doubt to have been committed by the defendant.
>
> Therefore, if you find beyond a reasonable doubt that the defendant committed an extraneous crime or bad act, then you may consider such evidence in assessing the defendant's punishment. However, if you have a reasonable doubt as to whether the defendant committed an extraneous crime or bad act, then you may not consider such evidence in assessing punishment.

Head asserts that an additional instruction was required. According to Head, the jury should have also been instructed that it must disregard evidence tending to show that Jontae Love committed certain robberies on July 24, 2009, because, in Head's view, there was no evidence presented that he had participated in those robberies. In essence, Head was asking the district court for an "instructed verdict" that the State had failed to prove his participation in the robberies. Head cites to no authority requiring that such an instruction be given, and we are aware of no such authority.[6]

Additionally, contrary to Head's assertion, there was evidence presented that he had participated in the other robberies. Specifically, Kimberly Almanza, who admitted that she was present when the robberies occurred, testified that Head had also participated. Additionally, two of the victims testified that there was a second man involved in the robberies, and the jury could have reasonably inferred from other evidence in the case that this second man was in fact Head. It was

---

[6] At trial, defense counsel acknowledged that his request was "very unusual" and provided no authority to support his requested instruction.

for the jury to decide whether the State had proven beyond a reasonable doubt that Head had participated in the robberies, and consistent with the law applicable to the case, the court's charge instructed the jury of that requirement. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a). On this record, we cannot conclude that the district court's charge was erroneous.

We overrule Head's fourth point of error.

### *Notice*

In his fifth point of error, Head asserts that the district court abused its discretion in admitting extraneous-offense evidence offered by the State during the punishment hearing. According to Head, the State failed to provide reasonable notice of its intent to introduce extraneous-offense evidence relating to crimes and bad acts that Head allegedly committed against Kristopher Fischer, Christina Tabor, Tracy Parker, and Anna Cory, each of whom testified during the punishment hearing.

We review a trial court's ruling regarding whether the State provided reasonable notice of its intent to introduce extraneous-offense evidence for abuse of discretion. *See Hayden v. State*, 66 S.W.3d 269, 271 (Tex. Crim. App. 2001); *Castillo v. State*, 186 S.W.3d 21, 33 (Tex. App.—Corpus Christi 2005, pet. ref'd). A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990); *Dixon v. State*, 358 S.W.3d 250, 259 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). We will not reverse a trial court's decision admitting evidence unless the decision is outside the "zone of reasonable disagreement." *See Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Castillo*, 186 S.W.3d at 34.

18

Article 37.07 of the Texas Code of Criminal Procedure governs the admissibility of evidence during punishment. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3. The statute provides that "[o]n timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of Evidence." *Id*. art. 37.07, § 3(g). Under Rule 404(b), extraneous-offense evidence is admissible only if "reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction." Tex. R. Evid. 404(b). The rule does not define what constitutes "reasonable" notice. However, article 37.07 provides some guidance. For extraneous offenses that have "not resulted in a final conviction in a court of record or a probated or suspended sentence, notice . . . is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act." Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g). Additionally, the Texas Court of Criminal Appeals has held that allowing a defendant access to the State's "open file," without more, does not constitute reasonable notice. *See Buchanan v. State*, 911 S.W.2d 11, 15 (Tex. Crim. App. 1995); *see also Roman v. State*, 986 S.W.2d 64, 66 (Tex. App.—Austin 1999, pet. ref'd) (applying *Buchanan* to article 37.07's notice provision). What is considered reasonable notice depends on the facts and circumstances of each case. *See Hayden*, 66 S.W.3d at 272-73 (Tex. Crim. App. 2001); *Webb v. State*, 36 S.W.3d 164, 178 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd); *Patton v. State*, 25 S.W.3d 387, 392 (Tex. App.—Austin 2000, pet. ref'd).

In this case, it is undisputed that Head timely requested and the district court ordered the State to provide notice of its intent to introduce evidence of extraneous offenses no later than 10 days prior to trial, which began on June 14, 2010. In its first written notice of intent to introduce evidence of extraneous offenses, filed on June 4, 2010, the State made no mention of

any extraneous offenses involving victims Fischer, Tabor, Parker, and Cory. However, in its second notice of intent to introduce evidence of extraneous offenses, filed on June 8, 2010, the State specified that it intended to introduce evidence of an aggravated robbery committed on July 24, 2009, in Travis County, against Anna Cory. And, in its third notice of intent to introduce evidence of extraneous offenses, filed on June 9, 2010, the State included the offense of aggravated robbery committed on August 9, 2009, in Travis County, against Fischer, Parker, and Christina Arnold-Juhl,[7] and the offense of aggravated assault committed on the same day and in the same county against Fischer.

Additionally, at the hearing on Head's motion to exclude the extraneous-offense evidence, the prosecutor represented that in a conversation with defense counsel on May 21, 2010, he had discussed the offense involving Christina Tabor, informed counsel that Tabor's last name in the offense report was Arnold-Juhl and that the witness was referred to by the State as "the bachelorette," and explained some of the circumstances surrounding the offense. The prosecutor further represented that in a separate conversation with defense counsel on May 26, he had informed counsel of the name of the detectives who had investigated the offenses involving Tabor, Fischer, and Parker and had mentioned the victims by name. Finally, the prosecutor represented that in another conversation with defense counsel "prior to or on June 2," the prosecutor went into more detail regarding the offenses, the victims, and other witnesses involved in the case. As for the separate extraneous offense involving Anna Cory, the prosecutor represented that the Austin Police Department did not inform the District Attorney's Office of the specific circumstances involving the robbery of Cory until June 7, 2010. The prosecutor added, "But as soon as we were aware that this

---

[7] Arnold-Juhl was the maiden name of Christina Tabor, who was married after the offense was committed but prior to trial.

was an appropriate case to come in as a punishment circumstance, we brought it to the attention of defense counsel and did so in a timely manner as best we could."[8]  Indeed, the record reflects that the following day, the State filed its second notice of intent to introduce evidence of extraneous offenses, which included the offense involving Cory.

On this record, we cannot conclude that the district court abused its discretion in finding that Head had reasonable notice of the extraneous offenses.  Regarding the offenses involving Fischer, Tabor, and Parker, the district court could have impliedly found that although written notice was not provided ten days prior to trial, defense counsel was given reasonable notice of those offenses through multiple conversations with the prosecutor prior to or on June 2, 2010, which was more than ten days prior to trial.  *See Hayden*, 66 S.W.3d at 273 (observing that notice need not be "formalistic" and does not have to be in writing, so long as actual notice is conveyed).  As for the offense involving Cory, the district court could have impliedly found that even though neither written nor oral notice was provided ten days prior to trial, the State had reasonably notified Head of the offense and the victim shortly after the State itself was informed of the circumstances of the offense.  *See, e.g.*, *Henderson v. State*, 29 S.W.3d 616, 625 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (notice was reasonable when given immediately upon discovering new evidence, which was eight days before evidence was introduced at trial); *Patton*, 25 S.W.3d at 394 (notice was reasonable when State provided notice as soon as it learned of offense, even though notice was not received by defendant until one day before trial); *see also West v. State*, No. 03-05-00371-CR, 2008 Tex. App. LEXIS 8599, 2008 WL 4899189, at *6 (Tex. App.—Austin Nov. 14, 2008,

---

[8]  As an officer of the court, an attorney's statements on the record, even if unsworn, are generally accepted as true unless the statements are objected to or disputed by opposing counsel. *See Holloway v. Arkansas*, 435 U.S. 475, 486 (1978); *Pitts v. State*, 916 S.W.2d 507, 510 (Tex. Crim. App. 1996).

pet. ref'd) (mem. op., not designated for publication) (notice given immediately upon discovering new evidence was reasonable when given five days before trial).

Moreover, even if the district court had abused its discretion in finding that the State provided reasonable notice, we could not conclude on this record that the allegedly deficient notice was harmful. *See* Tex. R. App. P. 44.2(b). The harm analysis in this context focuses on whether the deficient notice resulted from prosecutorial bad faith or prevented the defendant from preparing for trial. *See Hernandez v. State*, 176 S.W.3d 821, 824-26 (Tex. Crim. App. 2005); *Roethel v. State*, 80 S.W.3d 276, 282 (Tex. App.—Austin 2002, no pet.). Here, there is no allegation that the State acted in bad faith. In fact, during the hearing, defense counsel remarked that the prosecutor had been "very helpful" and "very cooperative in trying to help me get discovery." Nor is there any indication in the record that Head was prevented from preparing for trial. Head has made no showing, either in the court below or on appeal, of how his defense strategy might have been different had the State notified him earlier of its intent to introduce the extraneous-offense evidence. *See Hernandez*, 176 S.W.3d at 826. And Head did not seek a continuance of the punishment hearing, which would be some evidence that the deficient notice affected his trial strategy. *See McDonald v. State*, 179 S.W.3d 571, 578-79 (Tex. Crim. App. 2005). Finally, the record reflects that in addition to the multiple conversations defense counsel had with prosecutors concerning the extraneous offenses at issue, written notice of the State's intent to introduce evidence of those offenses was filed on June 8 and June 9, 2010, which was approximately one week before the evidence was admitted at the punishment hearing held on June 16 and 17. Defense counsel acknowledged at the hearing that he had received "adequate" discovery in the case, and he made no claim that he was unprepared for trial. On this record, even if the State's notice had been deficient, we could not conclude that Head was harmed by the deficiency. We overrule Head's fifth point of error.

22

## CONCLUSION

We affirm the judgments of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Field

Affirmed

Filed:   April 24, 2013

Do Not Publish